IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | | |
|---|---|---|
| Gayle R. Pennock, | ) | Civil Action No. 6:15-1490-RMG-KFM |
| Plaintiff, | ) | |
| | ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. | ) | |
| | ) | |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This case is before the court for a report and recommendation pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).

The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)) to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for disability insurance benefits under Title II of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed an application for disability insurance benefits ("DIB") on August 26, 2011, alleging that she became unable to work on August 26, 2011. The application was denied initially and on reconsideration by the Social Security Administration. On May 16, 2012, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff, her attorney, and G. Roy Sumpter, Ph.D., an impartial vocational expert, appeared on May 22, 2013, considered the case *de novo* and, on August 12, 2013, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding became the final decision of the Commissioner of Social

Security when the Appeals Council denied the plaintiff's request for review on February 25, 2015. The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

(1) The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.

(2) The claimant has not engaged in substantial gainful activity since August 26, 2011, the alleged onset date (20 C.F.R. § 404.1571 *et seq*).

(3) The claimant has the following severe impairments: degenerative disc disease of the lumbar spine, including spondylosis and facet arthropathy; degenerative disc disease of the cervical spine; bilateral carpal tunnel syndrome status post release; right AC joint arthropathy; obesity; and depression (20 C.F.R. § 404.1520(c)).

(4) The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).

(5) After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R § 404.1567(b) except the claimant could lift 20 pounds occasionally and 10 pounds frequently; she could sit, stand, and walk up to six hours each out of an eight-hour workday; the claimant could never use ladders; the claimant could occasionally climb stairs, as well as occasionally balance, kneel, stoop, crouch, and crawl; the claimant could perform handling and fingering on a frequent basis bilaterally; the claimant is limited to simple, repetitive tasks and instructions.

(6) The claimant is unable to perform any past relevant work (20 C.F.R. § 404.1565).

(7) The claimant was born on February 6, 1964, and was 47 years old, which is defined as a younger individual age 18-49, on the alleged disability date (20 C.F.R. § 404.1563).

2

(8)   The claimant has a limited education and is able to communicate in English (20 C.F.R. § 404.1564).

(9)   Transferability of job skills is not material to the determination of disability because the Medical-Vocational Rules support a finding that the claimant is "not disabled," whether or not claimant has transferable job skills (*See* SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

(10)  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that claimant can perform (20 C.F.R. § 404.1569 and 404.1569(a)).

(11)  The claimant has not been under a disability, as defined in the Social Security Act, from August 26, 2011, through the date of the decision (20 C.F.R. § 404.1520(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2)  has a severe impairment, (3)  has an impairment that equals an illness contained in the Social Security Administration's Official Listings of

3

Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. § 404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* § 404.1520(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy that the plaintiff can perform despite the existence of impairments that prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See *Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a

4

> preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## **EVIDENCE PRESENTED**

The plaintiff was 47 years old on her alleged disability onset date (August 26, 2011) and 49 years old at the time of the ALJ's decision. She completed the eighth grade and has obtained a tenth grade equivalency (Tr. 83). She last worked on August 23, 2011, as an equipment technician at Clemson University (Tr. 84-85).

### ***Medical Evidence Prior to August 26, 2011***

Nine years prior to her alleged onset date, a 2002 MRI of the plaintiff's lumbar spine showed a small disc herniation at L4-5, with mild facet arthropathy and degenerative disc disease at L4-5 and L5-S1 (Tr. 335).

In July 2003, while employed at Clemson University, the plaintiff suffered an injury to her lumbar spine and left lower extremity. The plaintiff subsequently filed a Workers' Compensation claim and entered into a settlement as she was assigned an impairment rating equivalent to 7% lumbar impairment (5% whole person) and limited to lifting no more than 28 pounds (Tr. 145-53).

The plaintiff saw Daxes Banit, M.D., in September 2003 regarding the injury in which she had been pushing a cart of chemicals and experienced a sudden onset of back pain (Tr. 308, 321, 335). Dr. Banit found the plaintiff oriented, that she could easily move

from a sitting to standing position, and that a straight-leg raise test was negative (Tr. 335). Dr. Banit's impression was that the plaintiff's lumbar disc protrusion was clinically nonsignificant, and he prescribed physical therapy and medication (Tr. 335-36).

The plaintiff also complained to Douglas Reeves, M.D., of right-shoulder, arm, and fingertip numbness (Tr. 357). Dr. Reeves recommended anti-inflammatory medication, as well as neck and shoulder range-of-motion exercises (Tr. 358). A physical exam in October 2003 showed minimally positive impingement signs, and Dr. Reeves opined that although he was not certain that carpal tunnel syndrome would explain her symptoms, he wanted to consider the possibility of injections or carpal tunnel release surgery (Tr. 359). The plaintiff underwent release surgery on her right carpal tunnel on December 18, 2003 (Tr. 360). She later testified that she also underwent left-side release surgery several years later (Tr. 88).

On December 30, 2003, Dr. Banit reported the plaintiff's "fair degree of noncompliance" with recommended treatment, including therapy and bracing (Tr. 337). He stated that he would refill her pain medication, but only one additional time until she began physical therapy (Tr. 337). The plaintiff underwent a physical therapy evaluation the following month (Tr. 308). During the evaluation, she described having experienced little relief since her carpal tunnel surgery, as well as working at her physically demanding job (Tr. 308). Following the evaluation, the plaintiff underwent instruction for a home exercise program (Tr. 308-09).

When the plaintiff returned to Dr. Banit in March 2004, he continued to cite a certain degree of noncompliance on her part, including the plaintiff's having only gone to therapy for a single session (Tr. 338). At Dr. Banit's recommendation, the plaintiff underwent a course of physical therapy in March and April 2004 (Tr. 310-17), but she reported no significant change in her condition following its completion (Tr. 318). A May 6, 2004, MRI showed mild diffuse facet arthropathy, most pronounced at L4-5 and L5-S1, with

6

no appreciable change in the L4-5 central disc protrusion from the plaintiff's 2002 MRI (Tr. 353). A subsequent lumbar discogram was discordant, and as a result, Dr. Banit declined to recommend fusion surgery (Tr. 345-46).

On June 30, 2004, the plaintiff underwent a functional capacity evaluation, pursuant to which Dr. Banit opined that she could lift up to 28 pounds safely; could push/pull approximately 50 or 60 pounds; could carry 30 pounds; and could occasionally sit, stand, bend, squat, and kneel (Tr. 321, 347). The following month, Pickens Patterson, M.D., of Foothills Pain and Anesthesia Associates, conducted a physical examination on referral from Dr. Banit. The examination was characterized as "essentially normal." The plaintiff stated that without her medications, her pain was a ten out of ten, but, with medications, her pain was five out of ten. Dr. Patterson recommended Lortab and muscle relaxants in connection with the plaintiff's symptoms (Tr. 355-56).

On August 19, 2004, Michael Grier, M.D., found the plaintiff's lumbar spine diffusely tender (more on the left than the right), while her gait was mildly antalgic (but she had no particular limp), her cranial nerves were intact, and her neck exhibited full range of motion (Tr. 329). Dr. Grier recommended lumbar facet joint injections, which the plaintiff tolerated well without complications (Tr. 331). However, the plaintiff reported no significant relief of her symptoms, and Dr. Grier thereafter administered a left-side lumbar facet joint medial branch nerve block and a lumbar medial branch nerve radiofrequency lesion/ablation (Tr. 403, 406, 414). In February and March 2005, the plaintiff reported that her symptoms had improved (Tr. 373-74).

A May 2005 MRI of the plaintiff's cervical spine showed mild diffuse degenerative changes and disc bulges, but no disc herniation, spinal stenosis, fracture or subluxation (Tr. 354). The following month, the plaintiff was referred to Carol Burnette, M.D., for an impairment rating regarding the work injury in 2003. Dr. Burnette assessed the plaintiff's condition and assigned to her a rating of a 7% impairment in her lumbar spine,

7

which was equivalent to a 5% whole person impairment (Tr. 377-80).  Dr. Burnette and Dr. Grier further opined that the plaintiff was likely at her maximum level of medical improvement (Tr. 374, 379).  In July 2005, Brian Redmond, M.D., also reported that an MRI had shown acromioclavicular ("AC") joint changes, fluid, and swelling, as well as central impingement of the plaintiff's rotator cuff tendon with tendonitis (Tr. 361).  The plaintiff was also diagnosed with and received treatment for mild obstructive sleep apnea (Tr. 457, 460).

An MRI of the plaintiff's lumbar spine in November 2006 showed a L4-5 disc bulge and broad central protrusion; a L5-S1 right-side disc protrusion (without S1 root displacement); and moderately severe L4-5 facet arthropathy and degeneration (Tr. 400). A nerve conduction study the following month was essentially normal, without signs of focal or generalized peripheral neuropathy, radiculopathy, or other pathology (Tr. 421).  The plaintiff also complained of left hip pain and tenderness, and she underwent a set of SI joint injections (Tr. 420, 423, 430).  She subsequently reported that her hip pain had improved (Tr. 384).

In October 2007, the plaintiff underwent radiofrequency lesion/ablation of her left lower lumbar medial branch nerves, and she reported good relief of pain (Tr. 390).  In January 2009, she underwent a right lumbar medial branch nerve radiofrequency lesion/ablation (Tr. 438).  Although the plaintiff reported that the procedure was not successful, she subsequently reported to Dr. Grier that her low back pain was improved (Tr. 392-93).  The plaintiff's condition in the following months was stable, though she reported signs of depression in September 2009 (Tr. 394-95).  In response, Dr. Grier gave the plaintiff samples of Pristiq and Cymbalta (Tr. 395).  Within two months, the plaintiff exhibited no major signs of depression, anxiety, or psychosis (Tr. 396).  Dr. Grier thereafter repeatedly reiterated that the plaintiff had no signs of depression, anxiety or psychosis (Tr. 370, 397-99), though he also noted that neither Cymbalta nor Pristiq had exhibited a large effect on her mood (Tr. 399).

On January 19, 2011, the plaintiff was referred to Dr. Burnette for a repeat impairment evaluation in regard to work-related chronic back, left SI joint, and left lower extremity pain. Dr. Burnette found the plaintiff mildly tender to palpation in her mid to low lumbar spine, and her lumbar range of motion was limited, though a straight-leg raise test was negative, and the plaintiff's extremity range of motion was normal. After reviewing the plaintiff's history, Dr. Burnette updated the plaintiff's permanent lumbar spine impairment rating to 11% (equal to an 8% whole body impairment rating) and added a 2% impairment rating for the plaintiff's left lower extremity, due to her complaints of chronic left SI joint pain and strain (Tr. 367-68). Dr. Burnette opined that the plaintiff should not perform lifting greater than 28 pounds; no prolonged standing, sitting, or walking at one time; and should not squat or perform sustained or repetitive bending (Tr. 368). Dr. Grier subsequently wrote a letter on June 17, 2011, in which he opined that these restrictions were consistent with the June 2004 functional capacity evaluation that placed the plaintiff at the light exertional level of work (Tr. 148). He further opined that the plaintiff could not perform three of the duties the plaintiff could be asked to perform in her job at that time, including lifting equipment, maintaining floors by waxing, buffing, and dry and wet stripping, and kneeling, stooping, bending, and twisting (Tr. 149-50).

### Medical Evidence After August 26, 2011

On September 15, 2011, the plaintiff returned to Dr. Grier and reported that her back symptoms were stable on medication, and she denied psychiatric symptoms. Dr. Grier found the plaintiff's lumbosacral spine diffusely tender, but the plaintiff had no new focal motor or sensory deficits; her distal pulses were palpable throughout; her deep tendon reflexes were symmetric and nonpathologic; her cranial nerves were intact; and her neck exhibited full range of motion (Tr. 446). On October 26, 2011, Dr. Grier stated that the plaintiff had a mental diagnosis of situational depression, he had not recommended psychiatric care, the plaintiff was on no prescription medication for any mental condition,

and she had a slight work-related limitation in function due to the mental condition (Tr. 445).[1]

In December 2011, Dr. Grier found the plaintiff's lumbosacral spine diffusely tender, but the plaintiff had no new focal motor or sensory deficits; her distal pulses were palpable throughout; her deep tendon reflexes were symmetric and nonpathologic; her cranial nerves were intact; and her neck exhibited full range of motion. Dr. Grier otherwise reported that the plaintiff's condition remained stable on her current pain medication (Tr. 448).

On January 31, 2012, state agency physician Carl Anderson, M.D., reviewed the plaintiff's medical records and opined that she retained the residual functional capacity ("RFC") to occasionally lift/carry 50 pounds; frequently lift/carry 25 pounds; stand, walk, and sit, each for six hours per workday; frequently use her upper extremities for handling and climb ramps and stairs; occasionally balance, stoop, kneel, crouch, or crawl; and never climb ladders, ropes, or scaffolds (Tr. 101-02).

Six weeks later, the plaintiff reported that Cymbalta was keeping her awake at night, so Dr. Grier gave her samples of Viibryd to try instead (Tr. 466). On examination, Dr. Grier found the plaintiff's lumbosacral spine diffusely tender, but the plaintiff had no new focal motor or sensory deficits; her distal pulses were palpable throughout; her deep tendon reflexes were symmetric and nonpathologic; her cranial nerves were intact; and her neck exhibited full range of motion (Tr. 466).

On April 20, 2012, state agency physician Hugh Clarke, M.D., independently reviewed the plaintiff's medical records and opined that she retained the RFC to

_____

[1]In January 2012, state agency psychologist Craig Horn, Ph.D., reviewed the medical record and opined that the plaintiff did not have a severe mental impairment (Tr. 99). Three months later, state agency psychologist Larry Clanton, Ph.D., independently reviewed the medical record and also opined that the plaintiff did not have a severe mental impairment (Tr. 112).

10

occasionally lift/carry 50 pounds; frequently lift/carry 25 pounds; stand, walk, and sit, each for six hours per workday; frequently use her upper extremities for handling; frequently climb ramps and stairs; occasionally balance, stoop, kneel, crouch, or crawl; and never climb ladders, ropes, or scaffolds (Tr. 114-15).

In June 2012, Dr. Grier again assessed diffuse tenderness in the plaintiff's lumbosacral spine. Again, the plaintiff had no new focal motor or sensory deficits, her distal pulses were palpable throughout, her deep tendon reflexes were symmetric and nonpathologic, her cranial nerves were intact, and her neck exhibited full range of motion (Tr. 465). In September 2012, in response to the plaintiff's reports of increasing back pain, Dr. Grier recommended a repeat series of left lumbar facet joint injections (Tr. 464).

The plaintiff underwent the left lumbar facet joint injections without complications on September 14, 2012 (Tr. 463). When she returned to Dr. Grier about three months later, she stated that the injections had helped (Tr. 462). Dr. Grier otherwise found her condition stable, and while she exhibited diffuse lumbosacral tenderness (with tender left lower facet joints), the plaintiff had no new focal motor or sensory deficits, her distal pulses were palpable throughout, her deep tendon reflexes were symmetric and nonpathologic, her cranial nerves were intact, and her neck had full range of motion (Tr. 462).

### Administrative Hearing Testimony

Prior to filing for disability, the plaintiff had a steady work history that included working for Clemson University as an equipment technician (Tr. 84). The plaintiff was terminated from that position, as she could no longer perform her job duties due to pain caused by her carpal tunnel syndrome and degenerative disc disease (Tr. 85). During the relevant period, the plaintiff drove, shopped, prepared meals, washed clothes, used a riding lawnmower, vacuumed, watched television, and cared for her cat (Tr. 81, 86, 89; see Tr. 189, 212-15).

11

At the hearing, the plaintiff testified that the problem that gave her the most trouble on the job is "working above my head. I've had carpal tunnel in both hands. I've had a shoulder, a rotor [sic] cuff repair on my right shoulder. They took an inch off my collar bone, and I got bulging discs in the back of my neck, lower back pain and upper back pain." The plaintiff further testified that she can only sit in a chair for about 15 or 20 minutes before she has to get up and move around. She can stand and walk for about ten minutes before she needs to rest. The plaintiff testified that she spends most of her time throughout the day, "in my recliner, on the couch, and in the bed" (Tr. 85-86).

During the administrative hearing, the ALJ asked the vocational expert to consider a hypothetical individual with the plaintiff's vocational profile who could perform a range of light work, lifting 20 pounds occasionally and ten pounds frequently; sitting, standing, and walking up to six hours each; occasional balancing, kneeling, stooping, crouching, crawling, and using stairs; frequent handling and feeling bilaterally; could not use ladders; and who was limited to simple, repetitive tasks and instructions. The vocational expert testified that such a hypothetical individual could perform the representative jobs as a cashier II or final inspector (Tr. 92).

### Appeals Council Evidence

On March 5, 2014, the plaintiff's attorney submitted a letter, along with several attachments, in further support of the request for review by the Appeals Council (Tr. 269-306). The first attachment is a September 16, 2013, report from Dr. Burnette (dated one month after the ALJ's decision) in which Dr. Burnette reiterated that she had evaluated the plaintiff for impairment ratings in 2005 and 2011 (Tr. 32, 273). On a new examination on September 16th, Dr. Burnette found that the plaintiff's lumbar flexion, extension, and lateral flexion produced pain, though the plaintiff's cervical spine range of motion was within normal limits (Tr. 33, 274). Dr. Brunette also found slight osteoarthritic changes in the plaintiff's interphalangeal joints, and her muscle stretch reflexes were symmetrically

12

decreased, though ranges of motion in the plaintiff's ankles, knees, hips, and upper extremities were normal (Tr. 33, 274). Dr. Burnette opined that the plaintiff appeared to have worsened over time in terms of increased pain and dysfunction; and "her recommended permanent work restrictions will be increased to no lifting greater than 10 [pounds] occasionally." Dr. Burnette further opined that based on her pain and dysfunction, "it is unlikely that she will be able to return to gainful employment" (Tr. 34, 275).

The second attachment is a September 16, 2013, Medical Source Statement (Physical) signed by Drs. Burnette and Grier in which they checked-off selections indicating that the plaintiff could occasionally lift/carry ten pounds; frequently lift/carry less than ten pounds; stand/walk for two hours total per workday (in periods of no more than ten minutes without interruption); sit for six hours total per workday (in periods of no more than one hour without interruption); must frequently elevate her legs to at least the level of her waist during the workday; occasionally reach, handle, feel, push, or pull; rarely climb, balance, stoop, kneel, crawl, or be exposed to heights, moving machinery, temperature extremes, chemicals, dust, noise, fumes, humidity, and vibrations; and that, further, she was incapable of even low stress work (Tr. 28-31, 277-80).

The third attachment is a September 16, 2013, Clinical Assessment of Pain questionnaire in which Drs. Burnette and Grier indicated, among other things, that the plaintiff's pain was present to such an extent as to be distracting to adequate performance of her daily activities or work; that she experienced severe pain in her right upper extremity, left upper extremity, back, hips, and left lower extremity, and moderate pain in her neck/shoulders; that pain would moderately severely interfere with the plaintiff's ability to maintain concentration; that pain would require the plaintiff to exceed the number of usual breaks during an eight-hour day; that pain would interfere with the completion of an eight-hour day; that the plaintiff would be absent from work more than four days per month;

13

and that the plaintiff would need three times daily to elevate her legs, lay down, and rest in a reclining chair for periods of 40 to 60 minutes (Tr. 25-27, 282-84).

The fourth attachment is a September 16, 2013, questionnaire that provided, "In order to perform sedentary work, a person must be able to walk and stand no more than two hours and sit six hours in an eight-hour workday." The questionnaire requested that Drs. Burnette and Grier apply that definition and opine whether the plaintiff was capable of full-time work at a sedentary level, in response to which they circled "No." Drs. Burnette and Grier responded to a question asking, "Have the restrictions reflected herein persisted since at least August 26, 2011?" by circling "Yes." In support of these restrictions, Drs. Burnette and Grier cited the plaintiff's "Previous lumbar spine MRI 11/15/06 [which] showed L5-S1 [and] L4-5 lumbar disc protrusion, annular tear [and] facet arthropathy" as well as her "known history of carpal tunnel syndrome and past carpal tunnel surgery" (Tr. 24, 286).

The fifth attachment is a September 16, 2013, typed statement that Drs. Burnette and Grier signed indicating that the limitations and opinions on the Clinical Assessment of Pain and Medical Source Statement (Physical) forms were present since August 26, 2011 (Tr. 23, 288).

The sixth attachment is two Function Report – Adult – Third Party forms, dated September 16 and 17, 2013, completed by the plaintiff's mother and daughter (Tr. 7, 15, 290, 299).

## ANALYSIS

The plaintiff argues[2] that the Appeals Council erred in failing to properly consider her new and material evidence and that under *Meyer v. Astrue*, 662 F.3d 700 (4th Cir. 2011) remand is required for consideration of the opinions of Drs. Grier and Burnette.

Here, the Appeals Council stated in its decision that it had considered the plaintiff's arguments presented in the brief of her attorney and the additional evidence provided by the plaintiff, but "this information does not provide a basis for changing the [ALJ's] decision." The Appeals Council listed each piece of evidence, noting that each one was dated September 16 or 17, 2013. The Appeals Council further stated, "The [ALJ]

---

[2]In the "Statement of Relevant Facts" in the initial brief, the plaintiff's attorney makes the following additional argument:

> The ALJ did not find any severe impairments that would cause Claimant pain and failed to include any limitations in the RFC to account for Claimant's experience of pain. In so finding, he stated that "[n]o treating source has reported that she has any disabling functional limitations or that she needs more intensive treatment." The ALJ did note in the decision that Claimant "testified that her back bothers her all the time, that it has bothered her for a while, and that she takes Flexeril and Ultram for pain." Despite acknowledging that Claimant suffered back pain due to work related injuries, the ALJ dismissed Claimant's testimony regarding her back pain because "[s]he has not been shown to have a medically determinable impairment of her back that would reasonably be expected to cause these symptoms." *Id.* This led the ALJ to conclude that the "strains apparently healed with treatment and caused no residual functional limitations." *Id.*

(Pl. brief 5-6) (emphasis in original)). The *id.* citation refers back to page 77 of the transcript, which does not contain the purported quotations, and the undersigned has been unable to find them elsewhere in the ALJ's decision. Moreover, the ALJ *did* in fact find severe impairments that could cause the plaintiff's alleged back pain - specifically, degenerative disc disease of the lumbar spine, including spondylosis and facet arthropathy, and degenerative disc disease of the cervical spine (Tr. 52). Furthermore, in assessing the plaintiff's credibility, the ALJ found that the plaintiff's "medically determinable impairments *could* reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision" (Tr. 59) (emphasis added). Lastly, the ALJ specifically stated that she "included limitations in the [RFC] addressing . . . the [plaintiff's] complaints of . . . pain" (Tr. 58), which included limiting the plaintiff to a range of light work with postural limitations (Tr. 57). As the argument does not appear to pertain to the facts of this case, it will not be considered further.

15

decided your case through August 12, 2013. This new information is about a later time. Therefore, it does not affect the decision about whether you were disabled beginning on or before August 12, 2013" (Tr. 2). The Appeals Council made the attorney's letter, brief, and all the exhibits part of the record (Tr. 5; *see* Tr. 261-306).

The law provides that evidence submitted to the Appeals Council with the request for review must be considered in deciding whether to grant review " 'if the additional evidence is (a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision.' " *Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 953 F.2d 93, 95–96 (4th Cir.1991) (en banc) (quoting *Williams v. Sullivan*, 905 F.2d 214, 216 (8th Cir.1990)). Evidence is new "if it is not duplicative or cumulative." *Id*. at 96. "Evidence is material if there is a reasonable possibility that the new evidence would have changed the outcome." *Id.* The United States Court of Appeals for the Fourth Circuit has explicitly held that "[t]he Appeals Council need not explain its reasoning when denying review of an ALJ decision." *Meyer v. Astrue*, 662 F.3d 700, 702 (4th Cir.2011). The court stated that when the Appeals Council receives additional evidence and denies review, the issue for the court is whether the ALJ's decision is supported by substantial evidence and reached through the application of the correct legal standard. *Id*. at 704. "In making this determination, we 'review the record as a whole' including any new evidence that the Appeals Council 'specifically incorporated . . . into the administrative record.'" *Id.* (quoting *Wilkins*, 953 F.2d at 96).

The plaintiff first argues that the Appeals Council erred "when it failed to make this new and material evidence part of the record on review, and, as such, the Appeals Council's failure to consider the new and material evidence submitted by the Claimant requires a remand" (pl. brief 16). The undersigned disagrees. First, the Appeals Council *did* make the evidence part of the record (*see* Tr. 5; *see* Tr. 7-34, 261-306). Second, while the Appeals Council did not specify whether the evidence qualified as new or material, the fact that the Appeals Council made the evidence part of the record has been considered by the Fourth Circuit as "an implicit determination [the plaintiff] submitted qualifying new evidence for consideration." *Martinez v. Barnhart*, 444 F.3d 1201, 1207 (4th Cir. 2006). As

a result, the Appeals Council was required to "consider" the evidence as part of its "evaluat[ion of] the entire record" to determine whether to "review the case." 20 C.F.R. § 404.970(b).   The plaintiff contends that the Appeals Council failed to consider the September 2013 evidence from Drs. Grier and Burnette, "which details [her] debilitiating limitations relating to her chronic pain" (pl. brief 13).   The undersigned disagrees.   The Appeals Council stated that it "considered the reasons you disagree with the decision in the material listed on the enclosed Order of Appeals Council" (Tr. 2), which includes all of the evidence submitted by the plaintiff to the Appeals Council (Tr. 5).   However, the Appeals Council concluded "that this information does not provide a basis for changing the [ALJ's] decision" (Tr. 2).   Accordingly, the Appeals Council adequately considered the evidence submitted by the plaintiff. *See Martinez*, 444 F.3d at 1207 (finding, based on similar language, that the Appeals Council adequately considered the new and material evidence submitted by the plaintiff in that case).

The plaintiff further argues, relying on *Meyer*, that remand is necessary for consideration of the evidence from Drs. Grier and Burnette (pl. brief 16-20; *see* Tr. 23-34, 273-88).   The ALJ in *Meyer* issued a decision denying benefits and noted therein that Meyer failed to provide an opinion from his treating physician. 662 F.3d at 702.   When Meyer requested review of his claim by the Appeals Council, he submitted a letter from a physician that detailed Meyer's injuries (from a fall) and significant physical restrictions.   The Appeals Council summarily denied review but made the letter part of the administrative record.   The Magistrate Judge in *Meyer* recommended that the Commissioner's decision be affirmed because the doctor who authored the report was not a treating physician, and thus the report should be accorded only minimal weight.   The district court adopted the Report and Recommendation. *Id.* at 704. The Court of Appeals, however, determined that the doctor was in fact a treating physician, the report submitted to the Appeals Council was the only report in the record from a treating physician, and the report filled an "evidentiary gap" emphasized by the ALJ. *Id.* at 707.   The court remanded for additional fact finding to reconcile conflicts between the newly submitted evidence and the evidence the ALJ had

17

considered, noting that the treating physician's opinion corroborated the opinion of an evaluating physician, which had been rejected by the ALJ, but other record evidence credited by the ALJ conflicted with the new evidence. *Id.* The court concluded: "Thus, no fact finder has made any findings as to the treating physician's opinion or attempted to reconcile that evidence with the conflicting and supporting evidence in the record. Assessing the probative value of competing evidence is quintessentially the role of the fact finder. We cannot undertake it in the first instance." *Id.*

The plaintiff argues that "[t]he record contains <u>no</u> evidence from Dr. Grier regarding the severity of [her] impairments or the resulting limitations" (pl. brief 6), and, as in *Meyer*,[3] remand is therefore required (*id.* 16-20). However, as pointed out by the Commissioner, unlike in *Meyer*, the record before the ALJ included a broad swath of longitudinal evidence from treating physician Dr. Grier, as well as Dr. Burnette. With respect to Dr. Grier's assessment of the severity of the plaintiff's impairments, the ALJ's opinion clearly shows the presence of such record evidence: the ALJ summarized in great detail Dr. Grier's specific findings regarding the plaintiff's impairments, including her treatment history and exacerbations in her symptoms in the period leading up to and during the relevant period (Tr. 59-60, 64-69). These records include objective findings—including repeated relevant period findings that the plaintiff's lumbosacral spine was diffusely tender, but she had no new focal motor or sensory deficits; her distal pulses were palpable throughout; her deep tendon reflexes were symmetric and nonpathologic; her cranial nerves were intact; and her neck exhibited full range of motion (Tr. 446, 448, 462, 464-66). Moreover, the records document the changes in the plaintiff's symptoms, whether in the periods of relative stability (e.g., Tr. 446), or the reported exacerbation in the plaintiff's

---

[3] In the reply brief, the plaintiff's attorney states as one of the similarities with the *Meyer* case that the plaintiff was "unrepresented before the ALJ and did not know to obtain specific opinions from her treating physicians, especially regarding her pain and limitations due to low back problems" (pl. reply brief 5). However, the record shows that the plaintiff was, in fact, represented by an attorney before the ALJ (Tr. 50, 80, 93-94, 133-34).

lumbar symptoms, after which she underwent a set of lumbar facet joint injections and then reported relief (Tr. 462-64).  Furthermore,  with respect to Dr. Grier's assessment of the plaintiff's limitations, while the record before the ALJ did not contain a comprehensive functional assessment from Dr. Grier during the relevant period, the record was not devoid of any opinion from him (*see* Tr. 148).  On June 17, 2011, two months before the plaintiff's alleged onset date of disability, Dr. Grier offered an opinion in view of what he saw as her capacity to undertake specific tasks, and, in so doing, he expressly referred to Dr. Burnette's opinion based upon her evaluation of the plaintiff on January 19, 2011 (Tr. 148-50). Notably, the ALJ also discussed at length Dr. Burnette's January 2011 assessment of the plaintiff's abilities (Tr. 58, 61-64).  Among other things, the ALJ contrasted the extent of the limitations described in the January 2011 assessment with Dr. Grier's specific objective findings in the treatment records postdating the assessment (Tr. 63-70).

Here, the additional medical evidence from Drs. Burnette and Grier would not change the outcome of the case because, for the reasons the ALJ described with respect to Dr. Burnette's January 2011 evaluation (endorsed by Dr. Grier) (*see* Tr. 148, 368), the additional evidence is not supported by the objective medical evidence of record.  As discussed above, Dr. Burnette had earlier opined as to a set of restrictions in January 2011 that the ALJ expressly declined to incorporate in their entirety (Tr. 62-64; *see* Tr. 368).  As the ALJ explained (Tr. 63-64), the significant limitations Dr. Burnette described in January 2011, including an inability to squat, perform sustained or repetitive bending, or prolonged standing, sitting or walking, were not consistent with even some of the results of her own contemporaneous examination, including an only mild increase in lumbar lordosis; only mild tenderness to palpation in the lumbar spine, paraspinal muscles, and left sacroiliac joint; and no abnormal findings related to the right hip, right sacroiliac joint, or in extremity range of motion (Tr. 367).  Moreover, the ALJ explained that the objective evidence in Dr. Grier's treatment records did not support the limitations Dr. Burnette found either (Tr. 64-70).

These findings included repeated references that the plaintiff's deep tendon reflexes were symmetric and nonpathologic, cranial nerves were intact, extremities had no new focal motor or sensory deficits, distal pulses were palpable throughout, she had full neck range of motion, deep tendon reflexes were symmetric and non-pathologic throughout, and the plaintiff was stable on current pain medication regimen (Tr. 446, 448, 462, 464-66). *See* 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.").

As argued by the Commissioner, in view of the ALJ's decision, it is clear that however inconsistent Dr. Burnette's January 2011 evaluation was with the record evidence that accompanied and followed it, this is even more true of the extreme limitations that Drs. Burnette and Grier found in the additional evidence before the Appeals Council (Tr. 23-34, 273-88). In these documents, Drs. Burnette and Grier now opine, among other things, that the plaintiff could only occasionally lift/carry ten pounds; frequently lift/carry less than ten pounds; must frequently elevate her legs, and was incapable of even low stress work (Tr. 28-31, 277-80). Dr. Burnette states in her September 2013 assessment that the plaintiff's condition had worsened (Tr. 34, 275), presumably in her view accounting for the disparity in the limitations presently alleged and those contained in her previous opinion (*see* Tr. 368). However, any allegation of such a significant deterioration was not borne out by Dr. Grier's treatment notes of record in which his only prominent report of physical exacerbation during the relevant period (or at any time after Dr. Burnette had last seen the plaintiff) was a September 2012 reference to the plaintiff's increasing back pain (Tr. 464). After that single reference, the plaintiff underwent left lumbar facet joint injections without complications on September 14, 2012 (Tr. 463). Further, following the procedure, Dr. Grier's subsequent treatment note referenced the plaintiff's improvement, at which time she once again had no new focal motor or sensory deficits, her distal pulses were palpable throughout, her deep tendon reflexes were symmetric and nonpathologic, her cranial nerves

20

were intact, and her neck had full range of motion (Tr. 462). Apart from the exacerbation precipitating the September 2012 injections, no other treatment notes documented significant deterioration and certainly none to the extent alleged in the additional medical evidence before the Appeals Council (Tr. 23-34, 273-88). Notably, the objective findings cited by Drs. Burnette and Grier that purportedly supported their finding that the plaintiff was unable to perform even sedentary work excluded any clinical evidence postdating January 2011 (Tr. 24, 286), the very month in which Dr. Burnette had described a set of restrictions significantly less limited than those she and Dr. Grier endorsed in the September 2013 evidence at issue (Tr. 368).

The plaintiff, citing page 32 of the transcript, quotes the ALJ as having found that "'[n]o treating source has reported that she has any disabling functional limitations or that she needs more intensive treatment'" and thus argues that the new evidence from Drs. Grier and Burnette fills an "evidentiary gap" as in *Meyer*, 662 f.3d at 707 (pl. brief 18).[4] The quotation at issue is not found on page 32 of the transcript, and neither the Commissioner (def. brief 23 n.6) nor the undersigned has been able to locate the purported quote in the ALJ's decision. The ALJ did state in the decision, "From the alleged onset date to the present, Dr. Grier did not articulate functional limitations regarding physical impairments in a medical source statement or his treatment notes" (Tr. 70). However, this more limited statement was presented in the context of a lengthy summary of the evidence found in Dr. Grier's records during the relevant period and simply explained the absence of a specific particular form of opinion as of the time of the ALJ's decision (Tr. 65-70). As argued by the

---

[4]  The plaintiff also argues, citing pages 31-32 of the transcript, that the ALJ "used the lack of a treating source opinion to discredit [her] credibility regarding the severity of her alleged symptoms and limitations and to support the ALJ's own RFC finding" (pl. brief 18). Again, the cited pages of the transcript are not part of the ALJ's decision. The undersigned has carefully reviewed the ALJ's assessment of the plaintiff's credibility (Tr. 71-74) and has found no mention of a lack of a treating source opinion as a basis for discrediting the plaintiff's credibility.

Commissioner, it certainly is not akin to the ALJ's statement in *Meyer*, relying on an absence of any treating physician opinion referencing limitations in the first instance. 662 F.3d at 703.[5] As discussed above, here, unlike in *Meyer*, the ALJ discussed in detail the longitudinal evidence from Dr. Grier and also had Dr. Grier's June 2011 opinion regarding the plaintiff's specific work tasks (Tr. 148), in which Dr. Grier had incorporated certain limitations propounded by Dr. Burnette in January 2011, which the ALJ also discussed in his opinion (Tr. 61-64; *see* Tr. 148, 348).

The Appeals Council also stated that, because the "new information is about a later time . . . it does not affect the decision about whether you were disabled" during the relevant period (Tr. 2). "[R]etrospective consideration of evidence is appropriate when 'the record is not so persuasive as to rule out any linkage' of the final condition of the claimant with his earlier symptoms.'" *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 341 (4th Cir. 2012) (quoting *Moore v. Finch*, 418 F.2d 1224, 1226 (4th Cir. 1969)). Here, Drs. Burnette and Grier repeatedly state that the information they provided in the new evidence dated back to the plaintiff's alleged onset date of disability, August 26, 2011 (Tr. 23-24, 28, 277, 286, 288). However, this means that, in the view of Drs. Burnette and Grier, at some point following the much less limited January 2011 functional assessment (*see* Tr. 368), the plaintiff's physical condition deteriorated. As discussed above, however, such an exacerbation was not corroborated by any of Dr. Grier's treatment records during the relevant period (Tr. 446, 448, 462, 464-66). As with his records after the plaintiff's alleged disability onset date, it is difficult to discern from Dr. Grier's treatment notes between January and August 2011 any evidence in support of such a deterioration (Tr. 364, 447).

---

[5] The court in *Meyer* found that because "the ALJ emphasized that the record before it lacked 'restrictions placed on the claimant by a treating physician,' suggesting that this evidentiary gap played a role in its decision," and Meyer subsequently provided this missing evidence to the Appeals Council, remand was necessary for the ALJ to assess the probative value of the competing evidence. 662 F.3d at 707.

Further, Dr. Grier continued to utilize Dr. Burnette's earlier assessment to opine as to the plaintiff's functional abilities on June 17, 2011, just two months before the relevant period began (Tr. 148).

For these reasons, although Drs. Burnette and Grier indeed alleged that the extreme restrictions they indicated applied to the whole period from and after the plaintiff's alleged onset of disability, the Appeals Council's finding that the additional records it received from the plaintiff did not apply to the relevant period does not render the Commissioner's decision unsupported by substantial evidence. Based upon the foregoing, the Appeals Council did not err in finding that the additional evidence submitted by the plaintiff did not provide a basis for changing the ALJ's decision (Tr. 1-2). As such, the Appeals Council did not err in declining to grant review. *See Grisham v. Colvin*, No. 12-1976, 2014 WL 98692, at *3 (D. Md. Jan. 9, 2014) ("After a review of the record, the Court finds that the evidence would not have likely changed the outcome. . . . The newly filled in assessment from Dr. Scotto is unsupported by any psychological or psychiatric testing . . . and is inconsistent with the other medical evidence in the record. The evidence is not material and would not have likely changed the ALJ's decision."); *Williams v. Colvin*, No. 12-529, 2013 WL 4806965, at *3 (E.D.N.C. Sept. 9, 2013) ("Dr. Singh's report is not material because the severity of the limitations he describes is inconsistent with his treatment notes and the other evidence of record. . . . The ALJ carefully considered all of the evidence in the record in making this determination and Dr. Singh's report is too inconsistent with the other substantial evidence of record to be granted significant weight by the Court. The ALJ's findings are supported by substantial evidence, and the Appeals Council did not err in denying review based on Dr. Singh's report . . . ."). After reviewing the record as a whole, including the new evidence incorporated by the Appeals Council, the undersigned finds that the ALJ's decision is supported by substantial evidence and reached through application of the correct legal standard. *Meyer*, 662 F.3d at 704.

23

## CONCLUSION AND RECOMMENDATION

This court finds that the Commissioner's decision is based upon substantial evidence and is free of legal error.  Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.


s/ Kevin F. McDonald
United States Magistrate Judge

April 13, 2016
Greenville, South Carolina